# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

RUTH VILLAREAL,

                    **Plaintiff,**

        **v.**                                    **Case No. 21-CV-729**

ROCKY KNOLL HEALTH CARE CENTER,

                    **Defendant.**

# DECISION AND ORDER

Plaintiff Ruth Villareal was discharged from her position as a licensed practical nurse with defendant Rocky Knoll Health Care Center in June 2020. (ECF No. 1 at ¶¶ 5, 17.) Villareal alleges that in terminating her employment Rocky Knoll discriminated against her and failed to accommodate her religious beliefs in violation of Title VII of the Civil Rights Act of 1964. (ECF No. 1 at ¶¶ 24, 25.) Rocky Knoll has moved for summary judgment. (ECF No. 28.) That motion is fully briefed and ready for resolution.

## 1.  Undisputed Facts

Rocky Knoll is a licensed and certified Skilled Nursing Facility owned and operated by Sheboygan County. (ECF No. 37 at ¶¶ 1-2.) Rocky Knoll hired Villareal in March 2012 as a licensed practical nurse. (ECF No. 37 at ¶ 3.) Rocky Knoll's licensed

practical nurses provide direct nursing care to Rocky Knoll residents and assist in supervising nursing assistants and other attendants. (ECF No. 37 at ¶ 4.)

On March 11, 2020, the World Health Organization declared COVID-19 a pandemic. (ECF No. 37 at ¶ 6.) On March 13, 2020, a nationwide state of emergency was declared. (ECF No. 37 at ¶ 7.) By the summer of 2020 the Center for Disease Control and Prevention (CDC) had identified older adults and individuals with underlying medical conditions as those most susceptible to severe illness or death from COVID-19. (ECF No. 37 at ¶ 12.)

In April and May of 2020 another nursing home in Sheboygan County, Sunny Ridge Nursing and Rehabilitation Center, experienced a major COVID-19 outbreak, which required intervention by the Wisconsin National Guard. (ECF No. 37 at ¶ 10.) The Sunny Ridge outbreak resulted in the first COVID-19-related deaths in Sheboygan County. (ECF No. 37 at ¶ 11.) As with Sunny Ridge, in June 2020 a substantial portion of Rocky Knoll's nursing home residents were those considered most vulnerable to COVID-19. (ECF No. 37 at ¶13.)

During the summer of 2020 the CDC recommended COVID-19 testing for health care professionals working in nursing homes. Specifically, it recommended initial viral testing of all health care professionals in nursing homes along with additional testing thereafter. (ECF No. 37 at ¶ 14.) Per the CDC's recommendations, on or about June 11, 2020, Rocky Knoll instituted a policy mandating COVID-19 testing every two weeks for

staff, vendors, and volunteers. (ECF No. 37 at ¶ 15.) Rocky Knoll's COVID-19 testing

policy provided the following:

a. All Rocky Knoll staff, contracted vendors, and volunteers working within a two-week time period of testing will be required to test for COVID-19 every two weeks as scheduled or as directed by Sheboygan County Public Health.

b. Rocky Knoll reserves the right to not allow entrance to any staff, contracted vendors, and/or volunteers during the time of a pandemic or any outbreak of disease in the community that is determined to threaten the health and or welfare of our residents or employees.

c. There will be no charge to the employee, contracted vendors, or volunteers for the COVID-19 test.

d. Refusal of testing for Rocky Knoll employees will be considered misconduct and will result in suspension without pay/and or termination. If an employee refuses to be tested he/she will be suspended for 5 days without pay. If the employee chooses to get tested within those five days the employee may return to work. If the employee refuses to get tested after five days, the employee will be terminated. Rocky Knoll reserves the right to deny entry of any contracted vendor or volunteer who does not get tested.

e. Requests for an accommodation based on disability, religion or other applicable protected status must be made in writing to the Rocky Knoll Administrator at least two working days prior to the next scheduled testing date.

(ECF No. 37 at ¶ 16.) The policy's express purpose was "[t]o help prevent and/or manage

the possible introduction and/or spread of COVID-19 in the facility and to ensure the

safety of all residents and co-workers." (ECF No. 37 at ¶ 17.)

Rocky Knoll's policy was developed by its administrator, its infection

preventionist, its director of clinical services, Sheboygan County Human Resources, the

Sheboygan County Administrator, and Sheboygan County Corporation Counsel. (ECF No. 37 at ¶ 20.) Rocky Knoll set up testing clinics for staff and scheduled times during which staff were to report for testing. (ECF No. 37 at ¶ 22.) Rocky Knoll used a COVID-19 Polymerase Chain Reaction (PCR) test which involved the insertion of a swab in one's nostril. (ECF No. 37 at ¶ 24.)

On June 12, 2020, the COVID-19 testing policy went into effect and was communicated to Rocky Knoll employees. (ECF No. 37 at ¶ 25.) The same day, Villareal emailed Rocky Knoll's Nursing Home Administrator, Kayla Clinton, to "formally request accommodation to decline COVID-19 testing based on religious as well as philosophical understandings." (ECF No. 37 at ¶ 26.) In the same email Villareal suggested a proposed accommodation that she would "continue to wear [her] county-provided N95 mask, … continue to check [her] temperature when entering and leaving the facility[, and adhere] to standard precautions such as washing [her] hands." (ECF No. 37 at ¶ 27.) These proposed accommodations were already required of all Rocky Knoll employees. (ECF No. 37 at ¶ 28.)

Clinton responded the same day by requesting additional information to understand what tenets of Villareal's religion would prevent her from being tested and whether it was COVID-19 specific. (ECF No. 37 at ¶ 29.) Three days later, on June 15, 2020, Villareal responded in an email with the following:

> I follow old law (Old Testament) a[s] well as new law (New Testament). I believe man is subject to ALL of YHVH's laws from the beginning of time

and that my salvation is based on obedience. ["]Do you not know that your bodies are temples of the Ruac, who is in you, whom you have received from YHVH? You are not your own; you were bought at a price. Therefore[,] honor YHVH with your bodies[."] (1 Corinthians 6:19-20).

I speak words of healing into my body. I do not base my health on science. I don't know of many viruses of sickness that are around or within my body, only that YHVH has the power to heal me based on my faith. ["]Then suddenly a woman … [c]ame up behind and touched the fringe of his cloak, for she said to herself, 'if I only touch his cloak, I will be made well.' Messiah turned, and seeing her said, 'take heart, daughter, your faith has made you well.'["] (Mathew[] 9:20-22). ["]Then he touched their eyes [of the blind men] and said, 'according to your faith let it be done to you.' And their eyes were opened.["] (Matthew 9:28-30).

I pray for Rocky Knoll and all who step inside. By taking a Covid test I would test my faith. Thank you for your time.

(ECF No. 37 at ¶ 31.) Immediately after receiving Villareal's email, Rocky Knoll—specifically, Sheboygan County Human Resources in consultation with Corporation Counsel—undertook efforts to conduct an individualized assessment to identify a reasonable accommodation for Villareal that would allow her to forego COVID-19 testing. (ECF No. 37 at ¶ 33.) Rocky Knoll assumed that Villareal's request was legitimate and that her religious beliefs were sincerely held. (ECF No. 37 at ¶ 34.) In June 2020 the only guidance from the United States Equal Employment Opportunity Commission (EEOC) related to COVID-19 testing was that mandatory COVID-19 testing by employers did not violate the Americans with Disabilities Act (ADA) and did not prevent an employer from following recommendations by the CDC. (ECF No. 37 at ¶ 35.)

5

Rocky Knoll concluded that allowing an untested staff member into the facility posed too great of a risk to the health and safety of its residents, many of which had significantly compromised immune systems. (ECF No. 37 at ¶¶ 36-37.) Rocky Knoll determined that any accommodation that would permit Villareal to work with Rocky Knoll's residents without being tested for COVID-19 would directly compromise the health and safety of those residents. (ECF No. 37 at ¶ 39.)

Rocky Knoll determined that there were two conceivable options for accommodating Villareal's request: offer her an indefinite leave of absence until the need for regular COVID-19 testing subsided or transfer her to a similar healthcare position within Sheboygan County. (ECF No. 37 at ¶ 41.) Rocky Knoll assessed the viability of each option. (ECF No. 37 at ¶ 44.) It determined that it did not have the ability within its budget to provide Villareal with an indefinite leave of absence. (ECF No. 37 at ¶ 46.) As for a lateral transfer, it identified as a potential option an open public health nurse position through the Sheboygan County Department of Health and Human Services, which offered similar pay to Villareal's position, required a similar skill range, and did not require COVID-19 testing. (ECF No. 37 at ¶¶ 47-48.) Upon further review, however, Rocky Knoll learned that the job required a Bachelor of Science in Nursing, a degree Villareal does not have. (ECF No. 37 at ¶¶ 49-51.)

On June 15, 2020, Clinton, on behalf of Rocky Knoll, informed Villareal that Rocky Knoll had evaluated options for her requested accommodation but determined that all

options would cause Rocky Knoll undue hardship and, therefore, her request was denied. (ECF No. 37 at ¶ 53.) Between June 15 and June 21, 2020, Clinton and Villareal exchanged several emails in which Villareal made it clear that she would not comply with Rocky Knoll's COVID-19 testing policy. (ECF No. 37 at ¶ 54.) Other than these email exchanges, Villareal provided no other information to Rocky Knoll about her requested religious accommodation. (ECF No. 37 at ¶ 55.) Clinton acknowledged Villareal's stance and informed her that, if she was not willing to comply with the testing policy, her employment would be terminated effective June 22, 2020. (ECF No. 37 at ¶ 56.) Because Rocky Knoll determined it could not reasonably accommodate Villareal's request to be exempted from COVID-19 testing, it discharged her, effective June 22, 2020. (ECF No. 37 at ¶ 57.)

## 2. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it "might affect the outcome of the suit" and a dispute is "genuine" only if a reasonable factfinder could return a verdict for the non-movant. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986). In resolving a motion for summary judgment, the court is to "construe all evidence and draw all reasonable inferences from the evidence in" favor of the non-movant. *E.Y. v. United States*, 758 F.3d 861, 863 (7th Cir. 2014) (citing *Gil v. Reed*, 535 F.3d 551, 556 (7th Cir. 2008); *Del*

*Raso v. United States*, 244 F.3d 567, 570 (7th Cir. 2001)). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and [in] opposition to the motion for summary judgment." *White v. City of Chicago*, 829 F.3d 837, 841 (7th Cir. 2016).

3.      **Analysis**

Title VII of the Civil Rights Act of 1964 prohibits employers from discriminating against employees and job applicants on the basis of, among other things, religion. 42 U.S.C. § 2000e-2(a). Under Title VII, "religion" includes: "All aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without an undue hardship on the conduct of the employer's business." *Id.* § 2000e(j). This definition places on employers a duty to provide a reasonable accommodation for an employee's religious beliefs and observances unless the employer can show that it is unable to do so without undue hardship. *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 68-69 (1986); *EEOC v. Ilona of Hung., Inc.*, 108 F.3d 1569, 1574 (7th Cir. 1997).

To establish a *prima facie* case of religious discrimination based on a failure to accommodate an employee must show: "(1) the observance or practice conflicting with an employment requirement is religious in nature; (2) the employee called the religious observance or practice to [the] employer's attention; and (3) the religious observance or

practice was the basis for [the employee's] discharge or other discriminatory treatment."

*Adeyeye v. Heartland Sweeteners, LLC*, 721 F.3d 444, 449 (7th Cir. 2013) (citing *Porter v. City of Chicago*, 700 F.3d 944, 951 (7th Cir. 2012)). "If the employee shows these elements, the burden then shifts to the employer to show that it could not accommodate the employee's religious belief or practice without causing the employer undue hardship." *Id.* (citing *Baz v. Walters*, 782 F.2d 701, 706 (7th Cir. 1986)).

Rocky Knoll argues that Villareal's Title VII failure to accommodate claim fails as a matter of law for two reasons. First, Villareal's refusal to get tested for COVID-19 was not based on a sincerely held religious belief. As a result, she cannot establish a *prima facie* case. Second, even if Villareal could establish a *prima facie* case, the undisputed facts show that Rocky Knoll could not accommodate her alleged religious belief without causing it undue hardship. Therefore, its decision to discharge her did not violate Title VII.

### 3.1.    Sincerely Held Religious Belief

To establish a *prima facie* case for a failure to accommodate claim under Title VII the employee must, among other things, "present evidence that would allow a reasonable jury to find that (1) the belief for which protection is sought is religious in the person's own scheme of things and (2) that it is sincerely held." *Adeyeye*, 721 F.3d at 451 (internal quotations and citation omitted). The sincerity element is fundamental because "if the religious beliefs that apparently prompted a request are not sincerely held, there has been no showing of a religious observance or practice that conflicts with an employment

requirement," which is an essential element of a *prima facie* case. *Ilona of Hung.*, 108 F.3d at 1575.

Villareal's deposition testimony reveals that she, at least in part, objected to COVID-19 testing because she perceived it as experimental and was concerned about how it might affect her body given her belief that it was not FDA approved. (ECF Nos. 37 at ¶¶ 96-98; 38 at ¶ 9.) Rocky Knoll argues that Villareal's deposition testimony "shows that her aversion to COVID-19 testing is a personal, secular preference redefined as a religious belief." (ECF No. 29 at 14.) Rocky Knoll also points out that on many prior occasions Villareal has sought out and submitted to medical intervention even though she wasn't sick. (ECF No. 29 at 15.) Therefore, her proclaimed objection to COVID-19 testing—that her religious beliefs require that she reject medical intervention in the absence of sickness—is a sham. (ECF No. 29 at 15.)

In response, Villareal explains that she must decline "medical intervention in the absence of sickness (which includes testing without symptoms) because it is her belief that when there is no sign of sickness, she must place her faith solely in YHVH that she will be kept whole." (ECF No. 36 at 6.) As evidence that her proclaimed beliefs are sincerely held, Villareal attests that she "has a mother, two brothers, and a sister who … share the same faith," that she "has traded shifts with her coworkers in the past to observe [her religion]," and that she has "always declined the annual flu vaccine mandate while she was working" for Rocky Knoll. (ECF No. 36 at 7.)

Villareal's routine submission to voluntary medical tests, evaluations, and procedures when she wasn't sick provides reason to doubt the sincerity of her belief that she must decline medical intervention when she isn't sick. However, "Title VII and courts … do not require perfect consistency in observance, practice, and interpretation when determining … whether a person's belief is sincere." *Adeyeye*, 721 F.3d at 453; *see also Grayson v. Schuler*, 666 F.3d 450, 454-55 (7th Cir. 2012) ("[A] sincere religious believer doesn't forfeit his religious rights merely because he is not scrupulous in his observance; for where would religion be without its backsliders, penitents, and prodigal sons?"). Therefore, despite Villareal's apparent inconsistency in adhering to her proclaimed belief of rejecting medical intervention when she isn't sick, whether the belief was in fact sincerely held is a genuine issue of material fact.

And while Villareal's concern over whether Rocky Knoll's COVID-19 tests were FDA approved calls into question whether her motive for seeking a testing exemption was purely religious in nature, whether her refusal to get tested for COVID-19 was also, at least in part, due to her proclaimed religious beliefs is a genuine issue of material fact.

Because determining whether Villareal's religious beliefs were sincerely held will necessarily involve an assessment of her credibility, it is an issue of fact more fit for a jury than resolution by this court on a motion for summary judgment. *See Ilona of Hung.*, 108 F.3d at 1575 (explaining that the issue of whether a belief is sincerely held "depend[s] on [an] assessment of the employee's credibility"); *see also EEOC v. Union Independiente de la*

*Autoridad de Acueductos y Alcantarillados de Puerto Rico*, 279 F.3d 49, 56 (1st Cir. 2002)

("Credibility issues such as the sincerity of an employee's religious belief are

quintessential fact questions. As such, they ordinarily should be reserved for the

factfinder at trial, not for the court at summary judgment." (internal quotations and

citation omitted)).

In sum, while Villareal's deposition testimony and past routine submission to

medical intervention even though she wasn't sick suggests that her refusal to participate

in COVID-19 testing was due at least in part to her concern that Rocky Knoll's tests were

not FDA approved, whether her refusal was also due to a sincerely held religious belief

remains a disputed issue of material fact. Therefore, the court will deny Rocky Knoll's

motion for summary judgment on the basis that Villareal's request for a COVID-19 testing

exemption was not based on a sincerely held religious belief.

### 3.2.    Undue Hardship

Title VII requires an employer to "try to accommodate the religious needs of its

employees, that is, to try to adjust the requirements of the job so that the employee can

remain employed without giving up the practice of his religion, provided the adjustment

would not work an undue hardship on the employer." *Reed v. Great Lakes Cos.*, 330 F.3d

931, 934 (7th Cir. 2003) (citing 42 U.S.C. § 2000e(j)). In claiming undue hardship, the

employer bears the burden of proving, "as a matter of law, that any and all

accommodations would have imposed an undue hardship [on it]." *Adeyeye*, 721 F.3d at 455 (citing 42 U.S.C. § 2000e(j); *Baz*, 782 F.2d at 706).

Title VII "does not require an accommodation that would cause more than minimal hardship to the employer or other employees." *See Endres v. Indiana State Police*, 349 F.3d 922, 925 (7th Cir. 2003) (citing *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 84 (1977)). In other words, an "undue hardship" is one that results in more than a minimal cost to the employer. *See Hardison*, 432 U.S. at 84; *see also EEOC v. Oak-Rite Mfg. Corp.*, No. IP99-1962, 2001 WL 1168156, at *11 (S.D. Ind. Aug. 27, 2001) ("[T]he more than *de minimis* standard allows imposition of only the most modest burdens on employers." (internal quotations and citation omitted)). Both economic and noneconomic costs can pose an undue hardship. *See Hardison*, 432 U.S. at 83. And an accommodation can be an undue hardship if it causes or increases safety risks or the risk of legal liability for the employer. *Oak-Rite Mfg. Corp.*, 2001 WL 1168156, at *10. "The inquiry ultimately boils down to whether the employer acted reasonably [in determining that a potential accommodation would cause it undue hardship]." *Id.* at *10 (citing *Beadle v. City of Tampa*, 42 F.3d 633, 636 (11th Cir. 1995)).

Rocky Knoll argues that, even if Villareal can establish a *prima facie* case, it could not accommodate her request for a COVID-19 testing exemption without causing itself undue hardship. First, Villareal's proposed accommodation of a testing exemption (allowing her to continue administering healthcare to its nursing-home residents) would

have risked the health and safety of its nursing-home residents and presented Rocky Knoll with a risk of legal liability. Second, other possible accommodations, such as an indefinite leave of absence or transfer to another position without mandatory testing, required more than *de minimis* costs.

### 3.2.1. Testing Exemption Accommodation

Rocky Knoll argues that it reasonably concluded that Villareal's requested accommodation of a testing exemption constituted an undue hardship because it would have presented a health and safety risk to its residents and a risk of legal liability.

In response, Villareal asserts that Rocky Knoll was not strictly enforcing its testing policy during the summer of 2020, and, therefore, it failed to prove that exempting her from testing would have caused it undue hardship. (ECF No. 36 at 11-13.) For example, she claims that "[i]f a[] Rocky Knoll employee was on vacation and missed one testing, they would be allowed to work until the next testing took place which could be 1-2 weeks out." (ECF No. 39 at ¶ 13.) She also claims that on "at least two occasions … Rocky Knoll allowed many employees to continue working at [its] facility without following its COVID-19 testing mandate," and that she "witnessed visitors come into the facility prior to her termination in the summer of 2020" but "Rocky Knoll never required visitors to be tested prior to entering its facility." (ECF No. 36 at 11 (citing ECF Nos. 38 at ¶¶ 13-14, 20; 32 at 18:8-20).)

Although undue hardship is generally treated as an issue of fact, where an employer can demonstrate that "the proposed accommodation would either cause or increase safety risks or the risk of legal liability" the issue can be resolved as a matter of law. *See Oak-Rite Mfg. Corp.*, 2001 WL 1168156, at *10 (citing as examples *Bhatia v. Chevron U.S.A.*, 734 F.2d 1382, 1383-84 (9th Cir. 1984); *Kalsi v. New York City Transit Auth.*, 62 F. Supp. 2d 745, 759-60 (E.D.N.Y. 1998); *Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 830 (9th Cir. 1999); *Lee v. ABF Freight Sys., Inc.*, 22 F.3d 1019, 1023 (10th Cir. 1994)); *cf. EEOC v. Geo Grp., Inc.*, 616 F.3d 265, 273 (3d Cir. 2010) ("A religious accommodation that creates a genuine safety or security risk can undoubtedly constitute an undue hardship ...."); *Draper v. U.S. Pipe & Foundry Co.*, 527 F.2d 515, 521 (6th Cir. 1976) ("[S]afety considerations are highly relevant in determining whether a proposed accommodation would produce an undue hardship on an employer's business."); *Mohamed-Sheik v. Golden Foods/Golden Brands LLC*, No. 303CV737H, 2006 WL 709573, at *4 (W.D. Ky. Mar. 16, 2006) ("Cases within the Sixth Circuit and other jurisdictions establish that an employer is not required to accommodate a religious concern when doing so would potentially create a safety risk to its employees or a legal risk for the employer.").

In June 2020 it was well known that COVID-19 could be spread by asymptomatic carriers and that the virus posed a particularly acute threat to those living in confined populations, such as prisons or nursing homes. *See, e.g., Johnson v. Gerresheimer Glass Inc.*, No-21-cv-4079, 2022 WL 117768, at *7 (N.D. Ill. Jan. 12, 2022) ("[B]y May 2020, when

Johnson notified Gerresheimer of her COVID-19 diagnosis, the seriousness of being infected with COVID-19 was readily apparent. It was known that COVID-19 is a highly contagious virus that can be spread even by asymptomatic carriers." (internal quotations and citation omitted)); *Roman v. Wolf*, No. 20-768, 2020 WL 1952656, at *3 (C.D. Cal. Apr. 23, 2020) ("Because of the highly contagious nature of the coronavirus and the, relatively high, mortality rate of COVID-19, the disease can spread uncontrollably with devastating results in a crowded, closed facility[.]").

The CDC had also by then identified older adults and individuals with underlying medical conditions—which individuals represented a significant portion of Rocky Knoll's resident population—as those most susceptible to severe illness or death from COVID-19. (ECF No. 37 at ¶¶ 12-13.) For healthcare professionals working in nursing homes, the CDC specifically recommended initial viral testing and additional, consistent testing thereafter, and Rocky Knoll enacted its testing policy to comply with these recommendations and to reduce the risk of exposing its residents to COVID-19. (ECF No. 37 at ¶¶ 14-18.)

In April and May of 2020—the months immediately prior to Rocky Knoll's implementation of its June 2020 testing policy and Villareal's subsequent accommodation request—a COVID-19 outbreak devastated Sunny Ridge Nursing and Rehabilitation Center, another nursing home in Sheboygan County. (ECF No. 37 at ¶ 10.) The Sunny Ridge outbreak resulted in the first COVID-19-related deaths in Sheboygan County, and

the nursing home eventually required intervention from the Wisconsin National Guard to manage the outbreak. (ECF No. 37 at ¶¶ 10-11.)

Given that by June 2020 it was common knowledge that asymptomatic carriers could spread the virus, as well as the prevailing testing guidance from the CDC and the temporal and geographic immediacy of the Sunny Ridge example, Rocky Knoll acted reasonably when it determined that allowing Villareal to interact with its residents while untested for COVID-19 would pose too great of a risk to the health of its vulnerable residents. Therefore, it has met its burden of demonstrating that Villareal's request to forego testing but continue working in its nursing home would have caused it undue hardship because it would have risked the health and safety of its residents.

Moreover, Title VII does not require employers to accommodate a religious practice if the accommodation could subject the employer to legal liability. *See, e.g., Bhatia*, 734 F.2d at 1383-84 (finding that allowing an employee to maintain a beard that interfered with breathing apparatus would expose the employer to the risk of an OSHA violation); *Kalsi*, 62 F. Supp. 2d at 759-60 (finding that permitting an employee to work without a hardhat would increase the employer's risk of liability); *Sutton*, 192 F.3d at 830 (finding that employing plaintiff without him providing a social security number would cause employer to violate federal law); *Lee*, 22 F.3d at 1023 (finding that accommodating employee's Sabbath would violate a collective bargaining agreement and cause undue hardship). Section 895.476 of the Wisconsin Statutes, which today immunizes businesses

from liability for COVID-19 related illness and death, was not yet the law in June 2020. *See* Wis. Stat. § 895.476 (adopted February 27, 2021). Therefore, Rocky Knoll has met its burden of showing that Villareal's requested accommodation also constituted an undue hardship based on the potential legal liability which might stem from granting it.

Villareal argues that evidence that Rocky Knoll did not strictly enforce its testing policies during the summer of 2020 undercuts its claim that exempting her from testing would have caused it undue hardship. Specifically, she claims that when in the afternoon of June 30, 2020, a third-party lab courier had a problem while transporting testing specimens collected from Rocky Knoll employees, some staff were allowed to work in the facility for two weeks without being tested. (ECF No. 39 at ¶ 14 (citing ECF No. 38-1 at 2).) Villareal also claims that on July 14, 2020, due to a Wisconsin-wide testing shortage, Rocky Knoll was forced to cancel a day of testing, but the staff were still permitted to continue working in the nursing home facilities. (ECF No. 39 at ¶ 14 (citing ECF No. 38-1 at 3).)

Neither of these alleged incidents, taken as true, bears on the reasonableness of Rocky Knoll's undue hardship analysis. First, two instances of testing being unavailable due to factors outside of Rocky Knoll's control does not show that it was not strictly enforcing its testing policies. Moreover, Rocky Knoll's testing policy went into effect on June 12, 2020, Villareal's request for a testing exemption was denied on June 15, 2020, and Villareal was terminated for failing to be tested effective June 22, 2020. (ECF No. 37 at ¶¶

Case 2:21-cv-00729-WED   Filed 11/21/22   Page 18 of 24   Document 43

25, 53-57.) At the time Rocky Knoll was evaluating whether it could grant Villareal a testing exemption without exposing its residents to an unreasonable health and safety risk and itself to an unreasonable legal risk, Rocky Knoll could not have foreseen that, weeks later, problems outside its control would result in some of its employees going untested for a limited period of time. In short, this evidence does not bear on the reasonableness of Rocky Knoll's conclusion that granting Villareal a testing exemption was an undue hardship.

Villareal also claims that she saw visitors in the Rocky Knoll facility during the summer of 2020, but that Rocky Knoll never required that they be tested before entering its facility. (ECF Nos. 39 at ¶ 20; 36 at 11.) In response, Rocky Knoll states that beginning around mid-March of 2020, through roughly October 2020, visitors were not allowed in its facilities regardless of testing status. (ECF Nos. 37 at ¶ 16(b); 32 at 18:12-19:12.)

Villareal was terminated on June 22, 2020, and she had not been in the facility since or around June 12, 2020. (ECF No. 37 at ¶¶ 25-26.) While it is possible she observed visitors entering Rocky Knoll after she was terminated, she does not provide any basis for knowing whether any visitors she observed had been tested. (ECF No. 39 at ¶ 20.) And whether she saw a visitor (tested or untested) in the nursing facility prior to Rocky Knoll's implementation of its testing policy is irrelevant to whether exempting her from that policy, once enacted, would have been an undue hardship for Rocky Knoll.

Finally, Villareal claims a Rocky Knoll employee vacationed in Arizona on or around March 20, 2020, was exposed to COVID-19, and was allowed back into Rocky Knoll's facilities immediately upon returning from Arizona, despite exhibiting COVID-19 symptoms. (ECF No. 39 at ¶ 21.) Villareal has not set forth facts establishing that she has personal knowledge of the fact that this employee had vacationed in Arizona. (ECF Nos. 38 at ¶ 21; 39 at ¶ 21.) Nor has she provided a basis for her claim that the employee had been exposed to COVID. (ECF Nos. 38 at ¶ 21; 39 at ¶ 21.) Nor has she presented any evidence that Rocky Knoll knowingly allowed an employee that had been exposed to COVID-19 into its facility. (ECF No. 39 at ¶ 21.) Even if Villareal had admissible evidence supporting this claim, by her own admission this incident took place in March 2020, when little was known about the virus and over two months before Rocky Knoll implemented its testing policy. As such, this alleged March 2020 incident has no bearing on Rocky Knoll's undue hardship analysis.

Villareal also advances a cursory argument that expert testimony is necessary to assess whether and to what extent allowing her into the nursing home untested in the summer of 2020 could have impacted the health and safety of Rocky Knoll's residents. (ECF No. 36 at 13-14.) But it is beyond debate that COVID-19 can be spread by asymptomatic individuals, that it has the potential to spread rapidly in confined populations, and that it can lead to severe sickness and death, especially within a vulnerable population like Rocky Knoll's. *See, e.g., Doe v. Mills*, 566 F. Supp. 3d 34, 39 (D.

Me. 2021) ("COVID-19 is a highly contagious disease that can cause serious illness and death."); *United States v. Cooper*, No. 01-512-05, 2021 WL 1629258, at *5 (E.D. Pa. Apr. 27, 2021) ("[I]t has now been well-established that the novel coronavirus is a highly contagious and dangerous virus that has thus far caused nearly 32 million Americans to contract COVID-19 and some 567,000 fatalities in this country alone.").

In sum, exempting Villareal from the testing requirement would have presented significant health risks to Rocky Knoll's resident population and would have likely exposed Rocky Knoll to legal liability. Villareal's proffered evidence in support of her claim that Rocky Knoll did not strictly enforce its testing policy in the summer of 2020 fails to raise a genuine dispute of material fact as to whether Rocky Knoll's conclusions were unreasonable. Therefore, Rocky Knoll has met its burden of showing that allowing Villareal to continue to work in its nursing home while going untested for COVID-19 would have caused it undue hardship.

### 3.2.2.  Indefinite Leave of Absence and Transfer

Villareal does not argue it was unreasonable for Rocky Knoll to deny her an indefinite leave of absence as an accommodation. Nor could she—granting Villareal a paid leave of absence beginning in June 2020 until the need for COVID-19 testing subsided would have caused Rocky Knoll to pay overtime and shift-differential pay in the amount of $5.00 per hour to Villareal's coworkers to cover the 32 hours per week that Villareal would have been unavailable. (ECF No. 37 at ¶ 45.) And it is undisputed that

Case 2:21-cv-00729-WED   Filed 11/21/22   Page 21 of 24   Document 43

Rocky Knoll did not have the ability within its budget to cover these costs for an indefinite amount of time. (ECF No. 37 at ¶ 46.) Under Title VII, "an employer cannot be required to incur substantial overtime expenses in order to accommodate an employee's religious practices." *Drazewski v. Waukegan Dev. Ctr.*, 651 F. Supp. 754, 758 (N.D. Ill. 1986); *see also Adeyeye v. Heartland Sweeteners, LLC*, 721 F.3d 444, 456 (7th Cir. 2013) ("The Equal Employment Opportunity Commission reads the *Hardison* language as meaning that regular payment of premium wages (such as overtime or holiday wage rates) for substitutes would impose an undue hardship[.]"). As such, it was reasonable for Rocky Knoll to conclude that providing Villareal with an indefinite leave of absence would be an undue hardship.

As for a transfer to a position that would not require testing, Rocky Knoll determined that the only such position available—and suitable given Villareal's experience, education, and paygrade—at the time of Villareal's accommodation request was a Public Health Nurse position through the Wisconsin Department of Health and Human Services. (ECF No. 29 at 24.) However, a Bachelor of Science in Nursing was a prerequisite for the position, a degree Villareal does not possess. (ECF No. 37 at ¶¶ 49-51.) Therefore, it determined that she was not qualified for the position. (ECF No. 37 at ¶ 52.)

Villareal does not contend it was unreasonable for Rocky Knoll to not transfer her to the Public Health Nurse position as an alternative accommodation. She does argue,

however, that there were other positions in Sheboygan County available on or around June 16, 2022, which did not require COVID-19 testing. (ECF No. 39 at ¶ 26.) To support that claim, she cites to meeting notes from a June 25, 2020, Sheboygan County Health and Human Services Committee Meeting during which the creation of two "Limited Term Employee" COVID tracing and support positions was approved. (ECF Nos. 38 at ¶ 24; 38-3 at 3.) She argues she would have been a great fit for these positions. Because Rocky Knoll did not consider transferring her to these positions, it has not met its burden of proving all accommodations would have imposed an undue hardship on it. (ECF No. 36 at 10-11.)

The two COVID tracing and support positions Villareal suggests would have been suitable, alternative accommodations did not exist until June 25, 2020 (ECF No. 38-3 at 3) and were not posted until June 26, 2020 (ECF No. 42 at ¶¶ 3-8). And, again, Villareal's request was denied on June 15, 2020, and she was discharged on June 22, 2020 (ECF No. 37 at ¶¶ 53, 57.) Therefore, the positions did not exist until after Rocky Knoll had evaluated and rejected Villareal's accommodation request. As such, their existence has no bearing on whether Rocky Knoll's undue hardship analysis was reasonable.

Villareal claims that there were other positions which Rocky Knoll could have transferred her to, but she has not provided any information about any such positions. Therefore, she has failed to raise a genuine dispute of material fact as to whether Rocky

Knoll's determination that transfer to another position was not a reasonable, alternative accommodation.

In sum, Rocky Knoll has met its burden of proving that all accommodations which would have allowed Villareal to remain employed and untested, but outside of Rocky Knoll's nursing home facilities posed more than minimal burdens, and, therefore, were also undue hardships.

**4.     Conclusion**

Although there is evidence suggesting that Villareal's refusal to get tested for COVID-19 was, at least partially, due to her belief that Rocky Knoll's tests were not FDA approved, whether her refusal was also due to a sincerely held religious belief remains a disputed material fact. Summary judgment, therefore, is not appropriate on that ground. However, there is no genuine dispute of material fact that all possible accommodations for Villareal's request for a testing exemption would have caused Rocky Knoll an undue hardship. Therefore, Rocky Knoll's motion for summary judgment (ECF No. 28) is granted. This action is dismissed. The Clerk shall enter judgment accordingly.

**IT IS SO ORDERED.**

Dated at Milwaukee, Wisconsin this 21st day of November, 2022.

WILLIAM E. DUFFIN
U.S. Magistrate Judge